**OFFICE OF THE FEDERAL PUBLIC DEFENDER**
**DISTRICT OF MARYLAND**
NORTHERN DIVISION
TOWER II, NINTH FLOOR
100 SOUTH CHARLES STREET
BALTIMORE, MARYLAND 21201-2705
TEL: (410) 962-3962
FAX: (410) 962-3976
TOLL FREE: (855) 213-8450
EMAIL: Katherine_Newberger@fd.org

**JAMES WYDA**
FEDERAL PUBLIC DEFENDER

**KATHERINE TANG NEWBERGER**
FIRST ASSISTANT FEDERAL PUBLIC DEFENDER

December 2, 2025

Hon. Stephanie A. Gallagher
U.S. District Court
101 W. Lombard Street
Baltimore, MD 21201

Re:   United States v. Zachary Campbell
       Criminal Case No. SAG-24-312

Dear Judge Gallagher:

Zachary Campbell has deep remorse for abusing ▓▓▓▓▓▓ and filming her in the bathroom. Mr. Campbell is devastated that he hurt ▓▓▓▓▓▓.[1] Although Mr. Campbell only blames himself for what he did, systemic failure plays a devastating role in this tragedy. For 15 years, Mr. Campbell and his mother begged for sex offender-specific treatment, but the state court system failed for all but one month to provide it. As the Presentence Report and Psychological Assessment of Travis Flower, J.D., Psy.D (Exhibit 1) lays out, Mr. Campbell was the victim of sexual abuse several different times as a child and adolescent. As a teenager, he began entering women's bathrooms, primarily on college campuses, peeking under stalls, and running out as soon as he was detected. Despite 16 convictions for peeping-Tom offenses, state court and probation records show only one referral for sex-offender-specific treatment and one month of such therapy even when he and his mother asked judges for the treatment that they had tried to obtain for Mr. Campbell on their own but could not afford.

Mr. Campbell faces a 15-year mandatory minimum penalty and recognizes that he deserves punishment for what he did to ▓▓▓▓▓▓. But it is not fair to impose the draconian penalty that Mr. Budlow seeks when Mr. Campbell and his mother repeatedly asked for help, and those with the authority and resources to provide that help failed to do so. Mr. Campbell's mother will address the Court at sentencing to explain how she hates what her son did but loves him and desperately wants him to get help. The Bureau of Prisons has sex-offender treatment programs, and once Mr. Campbell is on federal supervised release, the U.S. Probation Office will have sex-offender specific treatment providers as well as a host of other conditions available to protect the public and rehabilitate Mr. Campbell. Given the structure, treatment and scrutiny available on a life term of supervised release, a sentence of 15 years of incarceration followed by a life term of supervised release with strict conditions is the sentence that is sufficient but not greater than necessary to balance Mr. Campbell's personal history—including his prior unheeded requests for help—with the nature and circumstances of this offense.

---

[1]   Text is bold in sealed unredacted filing is redacted in the publicly filed version.

<u>United States v. Zachary Campbell</u>, SAG-24-312
Defense Sentencing Memo
Page 2

     **I.    Mr. Campbell has a distressing history of complex trauma that preceded his 16 convictions for peeping-Tom offenses and little help from state courts or state probation despite his pleas for treatment.**

Mr. Campbell endured years of familial and housing instability and multiple instances of sexual abuse. Dr. Flower explains how this complex trauma had a pervasive impact on Mr. Campbell's functioning and left him vulnerable to developing a litany of other problems—depression, isolation, substance abuse, and problematic sexual behaviors. Mr. Campbell and his mother sought—and begged state judges sentencing him for peeping-Tom offenses to provide—sex-offense specific treatment to address his behavior. Shockingly, even when state probation officers recommended sex-offender treatment and supervision protocols—a judge only ordered it once and it lasted for a month, too briefly for Mr. Campbell to make any meaningful progress.

     **A. Mr. Campbell experienced complex trauma as a child and adolescent.**

Dr. Flower's report, attached as Exhibit 1, explains how "Mr. Campbell's upbringing was reportedly impacted significantly by his parents' addictions, as well as <u>intergenerational family trauma</u>." Exhibit 1 at 3. Mr. Campbell's mother, Edgrenia Campbell, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, met his father when she was 16 and his father, Thomas Campbell, was 23 years old. <i>Id.</i> They had their first child together when Ms. Campbell was 17 years old, and they married when she was 21 years old. <i>Id.</i> She admits that her husband became addicted to crack cocaine and heroin in 1990 and introduced her to using crack in 1991. <i>Id.</i> She abused crack cocaine while pregnant with Mr. Campbell. <i>Id.</i> Thomas spent Mr. Campbell's early years in and out of jail. <i>Id.</i> According to Ms. Campbell, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, but she stayed with him. The family moved eight times during Mr. Campbell's childhood and adolescence because they could not keep up with rent, and they spent time residing in shelters.

Mr. Campbell was sexually abused for the first time when he was between 5 and 7 years old. <i>Id.</i> at 4.



When Mr. Campbell was 7 years old, Ms. Campbell left her husband and got sober so she would not lose custody of her children. <i>Id.</i> She obtained employment and public assistance and sought treatment for her own trauma. <i>Id.</i> She has been a pillar for her son, successfully employed and maintaining her own home. But to her great regret, she was unsuccessful in protecting Mr. Campbell from abuse.

Ms. Campbell reports that Mr. Campbell was sexually abused by ▇▇▇▇▇▇



Mr. Campbell also reported to a previous evaluator additional episodic abuse between the ages of 8 and 13 years old. <i>Id.</i> ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ <i>Id.</i>

While in therapy as an adolescent, he reported—and his mother learned—that in seventh grade while skipping school, a man offered him a ride to his house to have sex with a woman. *Id.* at 5. Mr. Campbell went with the man, but when he got to the man's home, the man sexually abused him before he could flee. While this final incident involved a single episode, the three other experiences of sexual abuse occurred regularly for the period in which the adults in his life unwittingly left him alone with the perpetrators.

His mother writes to the Court that in addition to the sexual abuse, "[g]rowing up Zachary suffered from low self esteem. . . . he was bullied a lot . . .. [h]e didn't have many friends." *See* Exhibit 2 (Letter of Edgrenia Campbell) at 1. He was diagnosed with a learning disorder and struggled in school. He had an IEP in grade school and repeated the second grade. Exhibit 1 at 5. He was transferred to the Frances M. Wood High School, an alternative school, in the 10th grade and psychological testing showed "significant differences in his performance in different domains of IQ testing (which is typically consistent with a diagnosis of learning disorder)." *Id.* From the records received, it is unclear what accommodations were given. Mr. Campbell dropped out of school in the 12th grade.

Despite these struggles, Mr. Campbell did not display anger. Rather he was a loving brother, son and grandson. His mother says, "Zachary is sweet and would do anything for whoever was in need." Exhibit 2 at 1. His older brother says, "Zachary has always been super close with us (his siblings)." Exhibit 3 (Letter of Thomas Campbell). His younger brother writes:

> [T]hroughout my life he has always been a protective, dependable, and caring presence. Growing up in Baltimore, Zack looked out for me – standing up for me when I needed support, keeping things in the house in order, and including me in activities like playing video games, going to the store, or getting ice cream. He even walked me to school and picked me up every day, showing a level of responsibility and love far beyond his age.

Exhibit 4 (Letter of Jacob Campbell).

Mr. Campbell loved his father deeply, too. He was devastated when he learned at age 17 years old that his father had died. Exhibit 1 at 5. "Edgrenia Campbell described this loss as devastating for Mr. Campbell, and she felt it had a significant impact on his life." *Id.* Indeed, his first peeping-Tom offense occurred around that time – in 2008. *See* PSR ¶ 122 (juvenile Trespassing arrest at age 17). According to historical mental health records, Mr. Campbell struggled with depression and attempted suicide in this time frame. Exhibit 1 at 8; *see also* Exhibit 2 at 1. Ms. Campbell's letter includes heartbreaking stories of Mr. Campbell calling himself "ugly," refusing to leave his room, and asking how she would feel if he died. His mother sought out mental health care for him, and some records note concern about his peeping-Tom behaviors. Exhibit 1 at 8. But all the records indicate general psychological treatment for depression—not sex-offender specific treatment. *Id.*

Although he "would give the shirt off his back if needed" by his family, Exhibit 4, and would do anything to help his grandmother and mother, Exhibit 2 and 3, Mr. Campbell was unable to achieve independence. His mother writes, "Zachary never had his own apartment or could never speak up for himself." Exhibit 2 at 1. Struggling with depression, Mr. Campbell resorted to drinking alcohol daily, indicating "it was typical for him to drink a pint of liquor in a day"—a habit of self-medicating that continued until his most recent arrest. Exhibit 1 at 6. He

also used marijuana regularly. *Id.* at 7. And for the last several years, he was not only drinking excessively but also abusing Xanax. *Id.* at 6.

### B. Mr. Campbell's problematic behaviors must be understood in the context of a trauma disorder.

Dr. Flower believes Mr. Campbell meets the diagnostic criteria for a trauma-disorder diagnosis and explains how post-traumatic stress increased his vulnerability for developing many of the problems that have plagued him in adulthood.

> Mr. Campbell reported a variety of traumatic adverse experiences in his early life. These included prenatal exposure to narcotics, multiple incidents of sexual abuse, neglect and abandonment by his father, the absence of other positive male attachment figures, witnessing domestic violence between his parents, chronic financial instability and housing insecurity, his mother's addiction and the later struggle of raising several children without a partner, his father's sudden death, and a history of learning disorder. It should be noted that the delayed and inconsistent reporting of Mr. Campbell's sexual victimization is a very common phenomenon: children who are sexually abused often keep the abuse secret due to shame, embarrassment, or fear of retaliation.
>
> It is unclear whether Mr. Campbell previously met full formal diagnostic criteria for posttraumatic stress disorder, which may have been masked by his subsequent self-medicating behaviors. In any case, these traumatic experiences have had a very broad impact on his life. A diagnosis of Other Specified Trauma/Stress Disorder is warranted to reflect the far-reaching effects on his emotional functioning, personality, and means of coping with stress. The term "complex" trauma commonly refers to trauma that occurs chronically over a long period of time while the person's personality and style of coping with the world are developing, and/or trauma that is perpetrated by someone in a relationship of trust and dependency. A more complex trauma history often results in a more complex symptom presentation, including an unstable or negative view of oneself, longstanding difficulty maintaining healthy or trusting relationships, and problems with impulsiveness and a reliance on unhealthy coping behaviors. Mr. Campbell's post-traumatic stress thus significantly increased his vulnerability for developing several of his other problems, including major depression, substance use, trust issues and other difficulties sustaining close relationships, extreme difficulty coping with school and employment, and sexualized acting-out behaviors.

*Id*. at 10.

Long before the offense involving ▇▇▇▇▇▇▇, he engaged in "sexualized acting-out behaviors," specifically voyeurism in women's bathrooms. As the Presentence Report lays out, Mr. Campbell has 16 adult convictions for peeping-Tom type offenses, spanning from January 20, 2010, to February 22, 2024, when he was arrested at Towson University after a woman identified him as the person she saw looking under a stall at her in a ladies' room. PSR ¶¶ 101-117. All of the peeping-Tom convictions involve a similar fact pattern: a woman reports that a man was in the women's bathroom, looking under the stall or holding a camera under the stall, and ran out as soon as she noticed him. *Id.*

United States v. Zachary Campbell, SAG-24-312
Defense Sentencing Memo
Page 5

      The number of times Mr. Campbell has engaged in this behavior is consistent with a voyeuristic disorder, which likely relates back to his own victimization. Dr. Flowers explains:

> The relationship between early abuse or neglect and later offending is complex; not all offenders have been abused, and not all abuse survivors go on to perpetuate abuse. In this case, however, it appears likely that the examinee's trauma history also contributed to the development of his voyeuristic disorder. Voyeuristic disorder is defined by the presence of recurrent and intense sexual arousal from observing an unsuspecting person who is naked, in the process of disrobing, or engaging in sexual activity, manifested by fantasies, urges or behaviors. The individual must have acted on these sexual urges with a nonconsenting person, or the sexual urges or fantasies cause clinically significant distress or impairment in social, occupational, or other important areas of functioning. It is classified as a paraphilic disorder, meaning that it is defined by the presence of deviant sexual interest. The causes of voyeuristic disorder are not well researched, but it is believed that factors such as significant emotional disturbance, impulsiveness, and/or substance addiction can lead to its development. Trauma often plays a key role in the development of these risk factors.

*Id.* at 10. Dr. Flowers' report summarizes treatment records from various programs, which diagnosed and treated Mr. Campbell with and for major depressive disorder. *Id.* at 8. But he has not received sex-offender specific treatment (except for a little more than a month as explained below).

      The lack of sex-offender specific treatment was not for lack of trying. After his two arrests as a juvenile for peeping-Tom behavior after his father's death, his mother tried to get him into Dr. Fred Berlin's sex-offense specific treatment program, however she could not afford it. *Id.* In the years that followed, Mr. Campbell and his mother repeatedly sought sex-offender specific treatment—but all his insurance would cover was general psychotherapy.

      State probation records show that when Mr. Campbell was first put on probation in 2010, he was sent to the Baltimore Community Resources Center, primarily for substance abuse testing and treatment. He was referred for an evaluation at Greenside Psychological, but they recommended continued substance abuse treatment and Narcotics Anonymous and individual therapy – but not sex-offender specific therapy. It appears that on his own, in 2011, he found Souldier Seyid Solutions, Advocate Support Services and Mosaic-North Baltimore – and provided verification of attendance in these programs to probation. But none provided sex-offender focused treatment.

      July 5, 2012, Mr. Campbell's attorney explained to the judge that his mother had gone to numerous agencies seeking help for her son to prevent the voyeuristic behavior—only to be rebuffed because he did not fit one criterion or another.[2] But the judge opted to sentence him to 12 months in custody, with no probation—and, thus, no court-ordered therapeutic services. *See* PSR ¶ 105.

      When Mr. Campbell was released, he was on probation for Circuit Court for Baltimore County Case No. 03-K-12-004791. PSR ¶ 106. In early 2013, probation records show, the probation agent asked Judge Cahill to authorize COMET (Collaborative Offender Management

---

[2]    The Defense obtained a recording of the guilty plea and sentencing in Circuit Court for Baltimore County Case No. 03-K-12-003405.

United States v. Zachary Campbell, SAG-24-312
Defense Sentencing Memo
Page 6

Enforcement Treatment) supervision, which was sex-offender specific supervision that would authorize "offense-specific treatment, medication, polygraph testing, computer monitoring, and electronic tracking and related curfew and/or geographical restrictions." However, a May 9, 2013, entry in the probation file notes probation's January 22, 2013, request for COMET supervision was not authorized by the court.

At a violation hearing before Judge Cahill on May 23, 2013, Mr. Campbell's probation agent stated: "I know his prior record, but I believe that the only way to prevent future incidents is for him to receive treatment."[3] She made clear she recommended COMET supervision and sex-offender specific treatment "to walk him through his thought process, why these crimes are occurring, and how to stop them." She also recommended GPS monitoring. While Judge Cahill said he appreciated the probation agent's position that "jail is not the answer," referring to the heightened supervision available, he said he was "not convinced yet," and sentenced Mr. Campbell to one-year incarceration instead and terminated probation.

Judges kept imposing similar sentences either without probation or, as probation records reflect, without the requirement of COMET supervision and only regular mental health counseling. The probation records suggest that probation left Mr. Campbell to find and pay for his own treatment providers, which was particularly difficult because he kept losing his health insurance.

To understand how much time Mr. Campbell spent in custody for these peeping-Tom convictions, counsel obtained dates of confinement from the Baltimore City Central Booking and Intake Facility, the Baltimore County Detention Center and the Anne Arundel County Detention Center (and provided them to Assistant United States Attorney Paul Budlow). The records, combined with the Presentence Report, reflect the following periods of incarceration:

| Admission Date | Release Date | Detention Facility | Case Number |
| --- | --- | --- | --- |
| 6/10/11 | 6/11/11 | Baltimore County Detention Center | 0C00341992 |
| 10/18/11 | 10/18/11 | Baltimore County Detention Center | ? |
| 2/17/12 | 2/27/12 | Baltimore County Detention Center | ? |
| 5/3/12 | 12/21/12 | Baltimore County Detention Center | 03K12003405<br>812094008<br>4C00347764<br>2C00342393 |
| 3/13/13 | 11/7/13 | Baltimore County Detention Center | 5C00375688<br>03-K-12-004791 |
| 12/21/13 | 3/6/14 | Central Booking | 2B02247947 |
| 6/27/15 | 12/18/15 | Central Booking | 2B02296583<br>2B02247947 |
| 5/24/16 | 6/28/17 | Anne Arundel Co. Detention Center | C-02-CR-16-001105<br>03-K-16-00470<br>5B02323522 |

---

[3]   The Defense obtained a recording of the violation of probation hearing in Circuit Court for Baltimore County Case No. 03-K-12-004791.

| | | | |
|---|---|---|---|
| 6/28/17 | Feb. 2018[4] | Central Booking | 2B02247947 |
| 4/20/18 | 6/27/18 | Central Booking | 5B02374685 |
| 7/28/18 | 1/28/19 | Central Booking | 2B02247947 |
| 1/28/19 | 10/8/19 | Anne Arundel Co. Detention Center | C-02-CR-16-001105 |
| 2/17/20 | 8/5/20 | Central Booking | 6B02415762 |
| 8/18/22 | 9/14/23 | Central Booking<br>Baltimore County Detention Center | 2B02433482<br>D-07-CR-22-003739<br>822152005 |
| 2/23/24 | 12/16/24 | Baltimore County Detention Center<br>CDF | D-01-cr-24-003188<br>C-03-CR-24-001440 |
| 12/16/24 | Present | Chesapeake Detention Facility | SAG-24-312 |

In early 2015, as Mr. Campbell struggled with depression, his mother called the Baltimore Crisis Center to have him hospitalized. Probation records indicate that he continued to receive treatment and medication for depression through the Baltimore Crisis Center and then Total Health Care. By June, he was incarcerated again for almost six months until a nolle prosequi was entered. PSR ¶ 129.

On May 23, 2016, he was arrested at the Arundel Mills Mall for another peeping-Tom offense. PSR ¶ 109. When sentenced January 24, 2017, he received 1 year followed by 5 years of supervised probation. For the first time, COMET supervision and a sex-offender evaluation were ordered by the Court according to the court file:

> 33. ☒ Other ① COMET SUPERVISION, ② RANDOM URINALYSIS ③ SUBMIT TO PSYCHO-SEXUAL EVALUATION immediately upon release and follow all treatment recommendations
> CC-DC-026 (Rev. 08/2015)   PRINT DATE 11/2015   Page 3 of 4

From probation records and the dates of incarceration received from Central Booking, however, despite this sentence, Mr. Campbell remained incarcerated on other matters until around February 20, 2018—the date of his first meeting with his probation agent after release from custody. On March 9, 2018, he was placed on a GPS monitored curfew, according to probation records, but there's no indication he was referred for a sex-offender evaluation. He was arrested on April 20, 2018, at Morgan State for another peeping-Tom offense. PSR ¶ 112.

After serving his 90-day sentence for that incident, he reported to state probation on June 28, 2018, and he was referred to Huber & Associates for a sex-offender evaluation. The probation officer's notes indicate they contacted Sheppard Pratt and Johns Hopkins about the availability of in-patient sex offender treatment, but it does not appear that he was referred for in-patient treatment. Rather he received a sex-offender evaluation at Huber & Associates and attended group sessions there. Although it is not reflected in the PSR, both records received from Central Booking and from the state probation office indicate that Mr. Campbell was reincarcerated in District Court Case No. 2B02247947 from July 28, 2017, to January 28, 2019.

---

[4] The records from Central Booking do not indicate when Mr. Campbell was released. Records received from state probation indicate that his agent did not meet with him until February 20, 2018, suggesting he was incarcerated until shortly before that date.

United States v. Zachary Campbell, SAG-24-312
Defense Sentencing Memo
Page 8

PSR ¶ 19. The probation file indicates his case was then closed. Thus, Mr. Campbell only received treatment at Huber & Associates for one month.

His first pre-sentence, court-ordered psychiatric evaluation did not occur until 2022. *See* PSR ¶ 113, 115. At his subsequent sentencing hearing in Circuit Court for Baltimore County on November 29, 2022, his attorney referenced the trauma history in that report and the family's efforts but inability to afford appropriate treatment for Mr. Campbell.[5] The attorney explained that Mr. Campbell had received piecemeal mental health care for depression, but not sex-offender specific treatment. His mother wrote to the Court, begging for in-patient treatment for her son. Mr. Campbell also expressly asked for help with his voyeurism. The judge sentenced Mr. Campbell to 1 year on one count and 1 year suspended on each of two other counts with three years of probation. But between those two cases and cases in Baltimore City and Anne Arundel County, it appears he remained in custody until September 14, 2023. At the July 24, 2023, hearing in Anne Arundel County District Court, the judge said the state's attorney and defense attorney both agreed that mental health treatment was needed, but his hands were tied because Mr. Campbell had already served close to the maximum 1-year penalty in pretrial detention.

When Mr. Campbell was released in September 2023, he was on probation for the Towson case, but the probation records do not indicate COMET Supervision, sex-offender treatment or GPS monitoring. On his own, he attended counseling at Turning Point and then BK Behavioral Health and then Positive Steps, but none provided the type of specialty treatment he needed. What Mr. Campbell needed—and still needs—was sex-offender specific treatment. Dr. Flower explains:

> Given the nature of the alleged offenses and the history of prior voyeuristic behaviors, participation in evidence-based sex offender treatment is recommended. Evidence-based (i.e., scientifically supported) treatment for psychosexual disorders exist in correction and community settings. In the federal correctional system, individuals with repeated offenses and paraphilic conditions are commonly referred to a more intensive, residential treatment program, followed by less intensive outpatient treatment. The treatment commonly includes multiple elements, centered primarily around a cognitive-behavioral therapy (CBT) approach to relapse prevention. As with treatment for substance abuse, the examiner recommends that the individual continue with sex offender treatment in the community after release from incarceration, so that treatment can coincide with the exposure to the stresses and temptations that are present in the community setting.

Exhibit 1 at 11-12.

The failure of the state to provide the necessary therapy—when there were so many warning signs and opportunities to provide it—led to a devastating tragedy: the abuse of ███████████████

---

[5]     The Defense obtained a recording of the guilty plea and sentencing in Circuit Court for Baltimore County Case No. C-03-CR-21-4195.

<u>United States v. Zachary Campbell</u>, SAG-24-312
Defense Sentencing Memo
Page 9

**II.    While the nature and circumstances of the offense are incredibly serious, what is just punishment must account for the systemic failure to provide help before the offense happened.**

Mr. Campbell intends to exercise his right of allocution to apologize to ███████ for what he did. Mr. Campbell was dealing with untreated demons and self-medicating with alcohol and Xanax when he abused ███████. Dr. Flower says: "The combination of substances reported by Mr. Campbell is quite concerning. His substance use increases the likelihood of disinhibited behavior, poor judgment, blackouts, and accidental or deliberate overdose." *Id.* at 13. But that is no excuse. His mother, who visits him every week and talks to him daily, says that he "beats himself up every day about his choices." Exhibit 2. Mr. Campbell will tell the Court he is disgusted with himself for what he did. He is also ashamed of his years of voyeuristic behavior. He will explain that he recognizes that there is a sick part of him and he wants help to understand it and address it.

His mother will also address the Court at sentencing. When law enforcement searched her home and told her what they believed he had done to ███████, body-worn camera captured her saying: ████████████████████████████████████████████████████ But Ms. Campbell also told law enforcement, and explains in her letter to the Court, that she loves her son unconditionally. Mr. Campbell's family has written letters to the Court addressing this complicated duality: They love Mr. Campbell and see all the good in him, but they are distraught over the harm he has caused ███████ and feel a great loss. His older brother explains that Mr. Campbell was the sibling who "most[] helped our mother when she could not get around. So the Zac I know is a loving caring person who always worked hard." Exhibit 3. But because ████████████████████████████████████████████████████.

What Ms. Campbell desperately wants is for someone to provide her son with the treatment he needs rather than just give up and warehouse him, which is, essentially, what happened in the state system with all his prior convictions. The Court must balance the need to punish Mr. Campbell with the trauma he faced and his and his mother's unanswered pleas for help. Given Mr. Campbell's peeping-Tom offenses, we should not have gotten here. He should have received meaningful and structured sex-offender specific therapeutic interventions. Had state probation followed through on their 2018 inquiries and placed him in an in-patient program, Mr. Campbell may never have abused ███████████████████████████████████████ ███████. What is just punishment must balance the harm he caused ███████ with the years he and his mother asked state court judges for help.

**III.   A life term of supervised release with strict conditions will protect the community and provide Mr. Campbell with the rehabilitation that he and his mother sought for years preceding the offense.**

The mandatory minimum penalty is sufficient to send a clear deterrent message to Mr. Campbell. While Mr. Campbell has been in and out of jail for the past 15 years, he has never served a sentence close to the mandatory minimum 15 years he now faces—and he has never served time in a prison. While he has been in continuous custody since February 22, 2024, the Bureau of Prisons will not award him credit from that date. Mr. Campbell received a 3.5-month sentence for the February 2024 peeping-Tom offense, *see* PSR ¶ 117, and 212 days (time served) as well as one year for violating probation by committing that offense, *see* PSR ¶¶ 113 and 115. Thus, Mr. Campbell did not enter federal custody until December 16, 2024, which is not reflected in the PSR but rather in the dates of custody received from the Baltimore County

Detention Center. Accordingly, the Bureau of Prisons will only credit him for time in custody since December 16, 2024. Thus, even with good-time credit, Mr. Campbell would have 12 years remaining on a 15-year sentence.

Because Mr. Campbell has never really received sex-offender specific treatment and certainly not coordinated with mental health and substance abuse treatment, it is not possible to say these interventions would not be enough to protect the public after Mr. Campbell serves the mandatory-minimum term of incarceration. A 15-year period of incarceration followed by a life term of supervised release with strict conditions is the sentence that is sufficient but not greater than necessary to protect the community, provided a specific deterrent to Mr. Campbell and meet the rehabilitative ideals of sentencing.

In considering what is necessary to protect the public, there are some uncomfortable facts that merit mention:

- Other than the images that Mr. Campbell captured of ▇▇▇▇▇▇, there is no child pornography on his devices.
- Despite ▇▇▇▇▇▇ chronological age, she appears physically mature in the videos.
- Mr. Campbell's peeping-Tom conduct targeted adult women not children. He primarily went to women's bathrooms on local college campuses—places where children were unlikely to be.
- From the reports that are available, the peeping-Tom offenses followed a similar fact pattern: the victim would see a man or cell phone peeking from underneath a stall and then the man would run out of the bathroom once the woman detected his presence. There are no allegations that Mr. Campbell ever tried to corner or assault a woman in the bathroom. In all incidents, he would quickly run out of the bathroom as soon as he was detected.

Given these facts, the filming and hands-on ▇▇▇▇▇▇ appear to be a crime of opportunity and do not manifest an interest in minors. While no less tragic for the victim, there is no indication from Mr. Campbell's conduct that he would do this to anyone other ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Indeed, the Presentence Report includes additional recommended conditions that directly limit contact with minors:

- 1) You must not have direct contact with any child you know or reasonably should know to be under the age of 18, including your own children, without the permission of the probation officer. If you do have any direct contact with any child, you know or reasonably should know to be under the age of 18, including your own children, without the permission of the probation officer, you must report this contact to the probation officer within 24 hours. Direct contact includes written communication, in-person communication, or physical contact. Direct contact does not include incidental contact during ordinary daily activities in public places.
- 2) You must not communicate, or otherwise interact, with any victims, either directly or through someone else, without first obtaining the permission of the probation officer.
- 6) You must not engage in an occupation, business, profession, or volunteer activity that would require or enable you to work with children within the prior approval of the probation officer.

<u>United States v. Zachary Campbell</u>, SAG-24-312
Defense Sentencing Memo
Page 11

- 19) You must not go to, or remain at, a place for the primary purpose of observing or contacting children under the age of 18.
- 20) You must not go to, or remain at, any place where you know children under the age of 18 are likely to be, including parks, schools, playgrounds, and childcare facilities.

In addition to these conditions, there are many others the Court can impose that will provide far more structure, resources and scrutiny than what Mr. Campbell received from state probation. The Additional Recommended Conditions include monitoring of devices that would quickly detect any return to voyeuristic behavior. Mr. Campbell's phone was seized when he was arrested at Towson University on February 22, 2024, because in a prior reported incident, the caller said they believed the perpetrator left the women's bathroom with a cellphone in his hand. When executing a search warrant on the phone, the police found the photos of the victim as well as from women's bathrooms. Several conditions of supervised release could provide a clear deterrent to this behavior as well as an early warning system.

- 3) You must allow the probation officer to install computer monitoring software on any computer (as defined in 18 U.S.C. § 1030(e)(1)) you use. You must not make any attempt to circumvent or inhibit the software after its installation. You must pay the costs of computer monitoring as directed by the probation officer.
- 4) You must submit your computers (as defined by 18 U.S.C. § 1030(e)(1)) or other electronic communications or data storage devices or media, to a search.
- 5) To ensure compliance with the computer monitoring condition, you must allow the probation officer to conduct initial and periodic unannounced searches of any computers (as defined in 18 U.S.C. § 1030(e)(1)) subject to computer monitoring. These searches shall be conducted for the purpose of determining whether the computer contains any prohibited data prior to installation of the monitoring software; to determine whether the monitoring software is functioning effectively after its installation; and to determine whether there have been attempts to circumvent or inhibit the monitoring software after its installation. You must warn any other people who use these computers that the computers may be subject to searches pursuant to this condition.
- 12) The defendant shall not own or possess any type of camera or video recording device without the approval of the probation office.

But most importantly, the Court can require U.S. Probation to provide needed treatment services—sex-offender specific treatment, mental health treatment as well as substance abuse treatment—in a coordinated way. The Additional Recommended Conditions include:

- 8) You must participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).
- 9) You must take all mental health medications that are prescribed.
- 11) You must not view or possess any visual depiction (as defined in 18 U.S.C. § 2256), including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, or sexually explicit conduct (as defined in 18 U.S.C. § 2256). You must not view or possess any visual depiction (as defined in 18 U.S.C. § 2256) including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of

sexually explicit conduct (as defined in 18 U.S.C. § 2256), that would compromise your sex-offense specific treatment.
- 13) You must participate in a sex offense-specific assessment.
- 14) You must participate in a sex offense-specific treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).
- 15) You must participate in a substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).
- 16) You must submit to substance abuse testing to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

We suggest changing the language of Additional Recommended Condition 10—the polygraph condition—to: "As part of any sex offender treatment, you must submit to periodic polygraph examinations if directed to do so by the treatment provider who will arrange for the polygraph examinations in consultation with the U.S. Probation Office." Judge Chasanow has adopted this language, most recently in *United States v. Forame*, DKC-24-00219, ECF No. 72 at 5; *see also United States v. Wheat*, JKB-21-0177, ECF No. 77. U.S. Probation recommends a stand-alone polygraph condition so that they can continue polygraphing Mr. Campbell after he completes sex-offender treatment. But given Mr. Campbell's history, we want U.S. Probation to keep Mr. Campbell in sex-offender treatment. Should Mr. Campbell's treatment providers and U.S. Probation feel that he has gotten everything he can out of sex-offender treatment, they can then ask the Court for a stand-alone polygraph requirement. This will force Court attention to this transition, which given the history is appropriate in this case.

The Court could also add stand-alone location monitoring, restricting him from getting within a specific distance of college campuses. Hopefully, with all the other conditions imposed, this restriction would not be necessary. But it is an option available to the Court—and is certainly a more humane and rehabilitative option than continuing to incarcerate Mr. Campbell past the mandatory-minimum penalty.

**IV.     Conclusion**

Given the supervised release conditions available to the Court, including sex-offender-specific treatment, mental health treatment and substance abuse treatment as well as an array of conditions geared toward monitoring his conduct, the sentence that is sufficient but not greater than necessary to satisfy the purposes of sentencing is the mandatory-minimum prison term followed by a life term of supervised release. Sadly, court-provided treatment did not come in time to protect the victim, but it is not too late to save Mr. Campbell. Given everything that Mr. Campbell has been through—and all the times his pleas for help were ignored—he deserves a chance. His mother is correct: "Jail, prison is Not the answer." Exhibit 2 at 1. Treatment and close supervision are.

Respectfully,

/s/

Katherine Tang Newberger
First Assistant Federal Public Defender

<u>United States v. Zachary Campbell</u>, SAG-24-312
Defense Sentencing Memo
Page 13


cc:    Paul Budlow, Assistant United States Attorney
       Ashley Crouch, U.S. Probation Officer